IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LOUISE MURPHY, Personal Representative
of the ESTATE OF BENSON MURPHY,
and LOUISE MURPHY, individually,
BENJAMIN MURPHY, SARAH MURPHY,
TYRONE MURPHY and VALENCIA ZAH,

        Plaintiffs,

vs.

                                       Civ. No. 02-1185 MV/RHS

LAWRENCE BITSOIH, EUGENE
ETHEREDGE, JEFFREY McDONALD, and
GERALD GALVIN, individually and in their
official capacities, and THE CITY OF
ALBUQUERQUE,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants Lawrence Bitsoih, Eugene

Etheredge, Jeffrey McDonald, Gerald Galvin, and the City of Albuquerque's Motion for

Summary Judgment Requesting Dismissal of Plaintiffs' Complaint, filed October 10, 2003 **[Doc.**

**No. 33]**. The Court, having considered the motion, briefs, and relevant law and being otherwise

fully informed, finds that the motion is well taken in part and will be **GRANTED IN PART.**

### BACKGROUND

I.    <u>The Alleged Use of Excessive Force.</u>

On or around July 9, 2002, at approximately 3:30 a.m., Plaintiff Valencia Zah telephoned

911 to notify the police that her boyfriend decedent Benson Murphy was threatening suicide.

The Albuquerque Police Department dispatched Defendant Officer Lawrence Bitsoih, Defendant



Officer Eugene Etheredge, and Officer Stewart Vigil to the home Ms. Zah shared with Mr.
Murphy.  Defendant Jeffrey McDonald, a sergeant, also responded to the call.  Sergeant
McDonald was the highest-ranking officer on the scene and therefore was in charge.  Dispatch
informed the officers over the radio that Mr. Murphy was armed with a knife and wanted to
"commit suicide by cop."

The majority of the remaining facts relevant to Defendants' motion were elicited from the
officers responding to Plaintiff Zah's emergency call.  The Court therefore first will set forth the
facts described by the officers, including any contradictory testimony among the officers.  The
Court then will describe the facts disputed by Plaintiffs.[1]

According to Defendants, the officers agreed to meet in a parking lot some distance south
of, and across the street from, Mr. Murphy's apartment to discuss their plan of action.  Defendant
Etheredge and Officer Vigil arrived first, followed by Defendants Bitsoih and McDonald.  Upon
arrival, Sergeant McDonald armed himself with a beanbag gun and a large can of mace.
Sergeant McDonald instructed Defendant Etheredge to take possession of a second beanbag gun
and Defendant Bitsoih to take his Colt AR-15 urban rifle.  Defendant Bitsoih slung the assault
rifle over his shoulder and also armed himself with two additional lethal weapons--a semi-
automatic .45 Kimber and a .380 Walther.  Although not the officer in charge, Defendant Bitsoih
admits that he "instructed" Defendant Etheredge to arm himself with a sidearm in addition to the
beanbag gun and to bring rubber gloves in case Mr. Murphy already had cut himself.  He also

_____

[1] In addition to Ms. Zah, Plaintiffs include Louise Murphy in her official capacity as the
duly appointed personal representative of the Estate of Benson Murphy, Plaintiff Louise Murphy,
the mother of decedent, in her individual capacity, Plaintiff Benjamin Murphy, the father of
decedent, and Plaintiffs Sarah Murphy and Tyrone Murphy, the siblings of decedent.

admits that he "instructed" the others, including his superior Sergeant McDonald, to turn on their belt tape recorders.

Before approaching Mr. Murphy's residence, Officer Vigil informed all of the officers that he had been dispatched to Mr. Murphy's residence earlier that week to respond to a call involving the "same type of an incident." Because of Officer Vigil's prior contact with Mr. Murphy and his experience as a crisis intervention officer, Sergeant McDonald designated Officer Vigil as the individual in charge of initiating and maintaining verbal contact with Mr. Murphy.

After establishing their plan of action, the officers crossed the parking lot and began heading north on foot down the street toward Mr. Murphy's residence. Before the officers saw Mr. Murphy, they heard him shouting comments such as, "Kill me, shoot me, I don't care." As the officers continued their approach toward Mr. Murphy's residence, they saw him standing near his apartment behind a retaining wall. Defendant Etheredge instructed Mr. Murphy to step out from behind the wall, and Mr. Murphy complied. Defendants Etheredge and McDonald allege that after Mr. Murphy stepped out from behind the wall, they noticed he was holding a butcher's knife approximately twelve inches long in his right hand.

Officer Vigil established verbal contact with Mr. Murphy and asked him to put down the knife. Mr. Murphy did not comply but rather continued to demand that the officers shoot him. Defendant Etheredge indicated that Mr. Murphy then began walking east, away from the police. He later turned back around toward the officers and stood in place. At this point, the officers contradict one another. Defendants Bitsoih and Etheredge maintain that Mr. Murphy began walking in an aggressive manner, briskly toward them, flailing his arms, and holding the knife

-3-

out at his side. Sergeant McDonald, however, does not characterize Mr. Murphy's approach as aggressive, angry, or violent. He also does not state that Mr. Murphy was approaching in a brisk or fast walk. Instead, he alleges that Mr. Murphy was "taking steps" toward, "approaching," or "clos[ing] the distance on" the officers. In none of the evidence submitted on summary judgment does Sergeant McDonald indicate that he felt threatened by or scared of decedent Murphy. Sergeant McDonald did not retreat or take cover. His fellow officers also did not retreat or take cover. During this final approach, Defendant Bitsoih maintains that Mr. Murphy was holding the knife at his side with the blade up in a threatening manner. Defendant Etheredge, however, indicated in his deposition that Mr. Murphy was holding the knife "blade pointed down and flailing around . . . in an aggressive manner," although he later changed his testimony after some prompting from counsel. Defendant McDonald does not specify the manner in which decedent Murphy allegedly held the knife.

Defendant McDonald indicated that Mr. Murphy was approximately fifteen feet away from him when Defendant McDonald fired a beanbag round, which hit Mr. Murphy in the stomach. Mr. Murphy "ben[t] down just a little bit," and then stood back up and continued "taking steps" toward the officers. Defendant McDonald then fired a second beanbag round, which struck Mr. Murphy on the chest. The round did not have an effect.

Thereafter, Defendant Bitsoih, who already had his urban assault rifle slung over his shoulder, began firing at Mr. Murphy. Defendant Bitsoih maintains that he waited to see Mr. Murphy take "one more step" after being shot with the second beanbag round before he fired his first shot from his assault rifle. It is unclear whether the step was aggressive or nonthreatening in nature.

-4-

After the shooting started, Defendant Etheredge, using his sidearm, also aimed at Mr. Murphy's center mass and discharged his weapon. Defendant Bitsoih stated that Officer Etheredge began firing "immediately after" his own shots. Defendant Etheredge maintains that after his first shot, Mr. Murphy was still standing and approaching, so he fired two additional shots. Defendant Etheredge fired a total of three shots and Defendant Bitsoih fired two or three shots. Neither Defendant Bitsoih nor Defendant Etheredge gave any warning prior to firing their weapons. After Mr. Murphy fell to the ground, Defendant Bitsoih removed the knife Mr. Murphy allegedly was still holding in his hand, and Defendant Etheredge placed him in handcuffs.

Plaintiffs dispute Defendants' contention that Mr. Murphy was armed with a knife. Plaintiff Zah maintains that Mr. Murphy did not have a knife five minutes prior to the officers' arrival, and that the police planted the knife after they shot Mr. Murphy. Plaintiff Zah, who overheard--but did not visually observe--the entire encounter between Mr. Murphy and the police through a neighbor's apartment window, maintains that she heard her and Mr. Murphy's kitchen screen door open and close after Mr. Murphy was shot and disabled by the police. Furthermore, immediately after the shooting, Plaintiff Zah noticed that the knives from her kitchen knife block were scattered in the sink. Plaintiff Zah contends that decedent Murphy, who lived in the home and was familiar with the knives, would not have scattered the knives in the sink in order to select one. Based upon this evidence, Plaintiff Zah surmises that one of the police officers entered her home to obtain a knife to plant on Mr. Murphy. Plaintiffs also question Defendants' contention that Mr. Murphy was lying on the ground still holding onto the knife after being shot twice from a beanbag gun and four times from two separate lethal weapons. Although the

transcript of Plaintiff Zah's 911 call indicates that the emergency operator questioned the caller about a knife, the transcript is unclear because it also indicates that neither Plaintiff Zah nor an unidentified male who picked up the line informed the operator that Mr. Murphy was in possession of a knife or even mentioned a knife at all.[2] The parties did not submit any additional forensic or other evidence regarding the knife allegedly found on decedent's person.

Plaintiffs further contend that if Mr. Murphy were holding a knife, he was doing so in a nonthreatening manner with the blade facing down. They also maintain that he was not aiming the knife at anyone. In addition, they contend that Mr. Murphy was intoxicated and that he did not take any aggressive action towards the officers. Plaintiff Zah, in addition to hearing Mr. Murphy demand to be shot, also heard the other officers yelling during the incident.

The evidence indicates that four of the shots fired by Defendants Bitsoih and Etheredge struck Mr. Murphy. One bullet struck his neck, one his left shoulder, one his left back, and one his left buttock. Officer Vigil did not discharge his weapon. Defendant McDonald only fired nonlethal shots from his beanbag gun. The officers' contact with Mr. Murphy from their arrival in front of his apartment through the time shots were fired lasted approximately five minutes.

II.   Police Procedures, Policies, and Guidelines.

The evidence regarding police training guidelines produced on summary judgment indicates that police officers generally cannot justify the use of lethal force on an unarmed suspect approaching them. Defendant McDonald testified that a suspect approaching with a

---

[2] The 911 transcript, however, does indicate that the unidentified male voice stated, "I'm ready to kill a cop. I'm ready to get in a . . . fight right now. You guys want to go at it?" Defendants make no claim, and the evidence does not show, that Defendants were aware of this information prior to the time Officers Bitsoih and Etheredge fatally wounded Mr. Murphy.

knife in a threatening manner could, within 21 feet, reach and attack an officer before the officer could draw his firearm and defend himself. Defendant Galvin testified similarly, but admitted that if an officer's weapon already were drawn, the distance would be shorter.

In their depositions, Defendants Bitsoih, McDonald, and Galvin stated that the officer with the most seniority on scene is in charge. They further testified that, as the highest ranking officer on site, Sergeant McDonald was the supervisor the night Mr. Murphy was shot. Police Chief Galvin also testified that chain of command does not preclude an individual officer from taking appropriate defensive action if the officer reasonably believes that a life is in imminent peril.

## STANDARD

Summary judgment generally is appropriate when a court determines that "'there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law.'" *Thrasher v. B & B Chem. Co.*, 2 F.3d 995, 996 (10th Cir. 1993) (citation omitted). Under Rule 56(c), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

To carry its initial burden, the moving party need not negate the nonmoving party's claim. *See Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997), *cert. denied sub nom. Smith v. Allen*, 522 U.S. 1148 (1998). "'Instead, the movant only bears the initial burden of 'showing'-that is, pointing out to the district court--that there is an absence of evidence to support the

nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings

and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on

file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S.

at 324 (quoting Fed. R. Civ. P. 56(e)). A plaintiff cannot rely upon conclusory allegations or

contentions of counsel to defeat summary judgment but rather must produce some specific

factual support of its claim. *See Pueblo v. Neighborhood Health Centers, Inc.*, 847 F.2d 642,

649 (10th Cir. 1988); *Fritzsche v. Albuquerque Municipal Sch. Dist.*, 194 F. Supp. 2d 1194, 1206

(D.N.M. 2002). "Where the record taken as a whole could not lead a rational trier of fact to find

for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Upon a motion for summary

judgment, a court "must view the facts in the light most favorable to the nonmovant and allow

the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v.*

*Standard Ins. Co.*, 985 F. Supp 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir.

1998). If there is no genuine issue of material fact in dispute, then a court must next determine

whether the movant is entitled to judgment in its favor as a matter of law. *See, e.g., Jenkins v.*

*Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

 The standard for analyzing a motion for summary judgment shifts slightly if, as here, a

defendant raises qualified immunity as a defense in a suit under 42 U.S.C. Section 1983.

Qualified immunity bars Section 1983 suits against defendants in their individual--but not

official--capacities. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 167 (1985) (citations omitted).

The qualified immunity defense was created to shield public officials "from undue interference

with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). It provides immunity from suit and not merely from liability. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). It therefore spares defendants the burden of going forward with trial. *See Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995) (citing *Powell v. Mikulecky*, 891 F.2d 1454, 1457 (10th Cir. 1989)).

Once a moving party raises the defense of qualified immunity, the nonmoving party must (1) assert facts which, if true, would constitute a violation of a constitutional right, and (2) demonstrate that the "right was clearly established at the time such that a reasonable person in the [movant's] position would have known that [the] conduct violated the right." *Garramone v. Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996) (citations omitted); *see also, e.g.*, *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). When a constitutional claim of excessive force is brought against a law enforcement officer, the first part of this inquiry requires a court to determine whether the parties' submissions, viewed in the light most favorable to the plaintiff, could show the officer's conduct violated a constitutional right. *Cf. id.* at 201. The second part of the inquiry requires a court to "assess[] the objective legal reasonableness of the action at the time of the alleged violation and ask[] whether 'the right was sufficiently clear that a reasonable officer would understand that what he [or she was] doing violates that right.'" *See Medina v. Cram*, 252 F.2d 1124, 1128 (10th Cir. 2001) (quotation omitted); *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citations omitted).[3]

---

[3] This second part grants officers protection beyond that afforded by a Fourth Amendment excessive force analysis on the merits. Even if a court were to decide that the facts alleged by a plaintiff constituted excessive force, the court must nonetheless still proceed to the dispositive qualified immunity inquiry and grant immunity to the officer if a reasonable person in

If a nonmoving party fails to satisfy its two-part burden, a court must grant the moving party qualified immunity. *See Medina*, 252 F.2d at 1128. If the nonmoving party, however, successfully demonstrates the violation of a clearly established right, the moving party assumes the normal summary judgment burden of demonstrating that no genuine issue of material fact exists that would defeat its claim for qualified immunity. *See Woodward v. City of Worland*, 977 F.2d 1392, 1396-97 (10th Cir. 1992) (citations omitted), *cert. denied*, 509 U.S. 923 (1993).

## DISCUSSION

Defendants move for summary judgment on the following grounds. First, Defendants argue that certain Plaintiffs do not have standing as a matter of law to bring claims under 42 U.S.C. Section 1983 and the New Mexico Tort Claims Act. Second, Defendants claim that qualified immunity protects Defendants Bitsoih, Etheredge, and McDonald against Plaintiffs' Section 1983 constitutional claims of excessive force in violation of the Fourth Amendment. Third, Defendants maintain that they are entitled to judgment as a matter of law on Plaintiffs' Section 1983 claims of encouraging a policy of excessive police force, supervising officers inadequately, hiring officers negligently, and training officers inadequately.[4] Fourth, Defendants argue that Officers Bitsoih and Etheredge were, as a matter of law, privileged to use deadly force against decedent Murphy under New Mexico law. Fifth, Defendants maintain that they are

_____

the officer's position would not have known that the conduct constituted excessive force. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).

[4] Defendants move for summary judgment seeking dismissal of Plaintiffs' Complaint in its entirety. Defendants, however, do not raise Plaintiffs' inadequate training claims in their supporting memoranda. Because the motion for summary judgment seeks dismissal of the entire Complaint and not dismissal in part, the Court will address the failure to train claims herein.

entitled as a matter of law to immunity from suit under the New Mexico Tort Claims Act

(NMTCA) for the remainder of Plaintiffs' tort claims. The Court will address each of these

arguments in turn.

I.      Do Certain Plaintiffs Have Standing to Bring Suit Under Section 1983 and the New
        Mexico Tort Claims Act?

        A.      Section 1983.

                1.      Plaintiffs' Personal Claims.

        In the Complaint, Plaintiffs allege they have suffered loss of "companionship," "love,"

"guidance," "counseling," and "enjoyment of life" as a result of decedent's death. They also

allege they have suffered "emotional distress." Defendants characterize these allegations as a

claim for loss of familial association, and Plaintiffs do not disagree.

        The Tenth Circuit has held that a deprivation of the right to familial association, including

association between a parent and child, or sibling and sibling, can create a cause of action under

Section 1983.[5] *See Trujillo v. Board of County Comm'rs*, 768 F.2d 1186, 1190 (10th Cir. 1985)

(extending the right to intimate association to siblings and allowing a mother and sister to bring a

Section 1983 claim for deprivation of that right); *compare Garramone v. Romo*, 94 F.3d 1446,

1449 (10th Cir. 1996) (a parent has a constitutionally protected interest in familial association

with her child) (citation omitted). Defendants argue, however, that Plaintiffs do not have

_____

[5] Although it is unclear whether Plaintiffs intended the familial association allegations to
establish a Section 1983 violation, a state tort law violation, or a violation of both federal and
state law, Defendants' summary judgment papers assume without contradiction that Plaintiffs
intended to allege a violation of both federal and state law. This interpretation is consistent with
the Court's obligation to view the papers in the light most favorable to the nonmoving party. *See
Trujillo v. Board of County Comm'rs*, 768 F.2d 1186, 1188 n.4 (10th Cir. 1985) (citations
omitted).

standing to bring claims for loss of familial association under Section 1983 because that Section

only provides a cause of action for violations of a plaintiff's personal rights and not the rights of

a third-party decedent.

It is a well-settled principle that standing to assert a Section 1983 claim requires a

plaintiff to assert a violation of a constitutional right personal to the plaintiff and not the right of

someone else. *See Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990) (citations omitted);

*see also Dohaish v. Tooley*, 670 F.2d 934, 936 (10th Cir.) ("It is quite true that there is also a lack

of standing. When we say standing, we mean that the § 1983 civil rights action is a personal suit.

It does not accrue to a relative, even the father of the deceased."), *cert. denied*, 459 U.S. 826

(1982). Accordingly, Plaintiffs must allege a police deprivation directed at themselves and not

decedent. *Cf., e.g., Trujillo*, 768 F.2d at 1190 (plaintiffs could not establish an intentional

deprivation of their rights by transferring the law enforcement officer's intent to deprive the

decedent of his rights to plaintiffs).

Although Plaintiffs do not identify the police deprivation on which they base their

familial association claims, Defendants assume Plaintiffs rest their claims on the officers' intent

to deprive decedent of his right to be free from excessive police force rather than Defendants'

intent to deprive Plaintiffs of their rights. This assumption has no basis in the record. Consistent

with its obligation to read the papers in the light most favorable to Plaintiffs, *see id.* at 1188 n.4,

the Court will construe Plaintiffs' deprivation claims as resting upon Defendants' intent to

interfere with Plaintiffs' rights to familial association. *Cf. Estate of Fuentes v. Thomas*, 107 F.

Supp. 2d 1288, 1295-96 (D. Kan. 2000) (construing the complaint liberally in plaintiff's favor

and finding that plaintiff alleged an intentional violation of a child's right to familial association

with the decedent).

To withstand summary judgment, however, each Plaintiff must allege and identify evidence raising an inference of intent to interfere with a particular personal relationship between that Plaintiff and the decedent that is protected by the freedom of intimate association. *See Trujillo*, 768 F.2d at 1189-90; *see also Fuentes*, 107 F. Supp. 2d at 1296. In this case, the Complaint does not contain any allegation of intent to interfere with a relationship between decedent and any of the Plaintiffs, and Plaintiffs fail to cite any evidence or specific facts in their summary judgment opposition showing that there is a genuine issue of material fact with respect to the intent to interfere requirement.[6] Plaintiffs therefore do not have standing as a matter of law to assert their personal Section 1983 claims. Accordingly, the Court grants summary judgment in Defendants' favor and dismisses Plaintiffs' federal constitutional claims for loss of familial association. *Cf. Trujillo*, 768 F.2d at 1190 (granting summary judgment against plaintiffs on their Section 1983 claims asserting deprivation of their rights to familial association because the record did not contain evidence of an intent to deprive plaintiffs of their relationship with their son and brother); *Fuentes*, 107 F. Supp. 2d at 1296 (granting summary judgment against plaintiffs on their Section 1983 claims asserting deprivation of plaintiffs' constitutional rights to

---

[6] Plaintiff Zah contends that she is entitled to recover under Section 1983 under a theory of bystander recovery. If Plaintiff Zah intended to argue that she is a foreseeable injured party under this theory, her argument must fail because conclusory allegations alone, without additional facts in support of those allegations, are not sufficient to withstand summary judgment. *See, e.g., Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988). Furthermore, in *Archuleta v. McShan*, the court held that "a bystander is unable to assert the kind of deliberate deprivation of his or her rights necessary to state a due process claim under section 1983." 897 F.2d 495, 498 (10th Cir. 1990); *see also id.* at 498-99 (citing case law to support its holding).

familial association with decedent because plaintiffs failed to cite any evidence of intent to interfere).

2.      Plaintiffs' Derivative Claims.

Plaintiffs also allege derivative Section 1983 claims on decedent's behalf arising out of Defendants Bitsoih's and Etheredge's unlawful use of force. Defendants argue, however, that as a matter of law only decedent's personal representative may maintain a derivative action on decedent's behalf and that the Court therefore must grant summary judgment in their favor.

In *Berry v. City of Muskogee*, the Tenth Circuit considered, among other things, who has standing to pursue a Section 1983 derivative action for violation of a decedent's constitutional rights. *See* 900 F.2d 1489, 1502 (10th Cir. 1990). *Berry* recognized that Section 1983 was silent with respect to who may bring a constitutional claim for a wrongful killing, but noted that 42 U.S.C. Section 1988 provided the court with guidance. *See id.* The court explained that Section 1988 authorizes federal courts to undertake a three-step process to determine whether to borrow state law to aid their enforcement of the civil rights statutes. *See id.* Section 1988 directs courts to (i) look to federal law to determine whether that law is suitable to effectuate Section 1983, (ii) if the federal law is silent or deficient, consider borrowing the law of the forum state, and (iii) reject application of the state law if it is inconsistent with the Constitution and the laws of the United States. *See id.* (citing 42 U.S.C. § 1988).

The *Berry* court declined under Section 1988 to apply the law of the forum state to determine the remedy, including who may bring suit, for wrongful killings. The court held that application of state law in some instances would be inconsistent with Section 1983 because it would unduly limit recovery for wrongful death civil rights actions when Congress "envisioned a

-14-

significant remedy for wrongful killings resulting from conduct proscribed by § 1983." *Id.* at

1503. The court instead "fashion[ed] a federal remedy," stating that a Section 1983 wrongful

death claim "should be a survival action, *brought by the estate of the deceased victim*, in

accordance with § 1983's express statement that the liability is 'to the party injured.'" *Id.* at

1506-07 (emphasis added) (citing 42 U.S.C. § 1983).

Under *Berry*, the estate of decedent Murphy is the appropriate party to bring the

derivative Section 1983 action. Plaintiff Louise Murphy, as personal representative of the estate

of Benson Murphy, therefore is the only Plaintiff with standing to bring the derivative Section

1983 claims on decedent Murphy's behalf. Accordingly, Defendants are entitled to summary

judgment in their favor, and the Court therefore dismisses all remaining Section 1983 claims

brought by Plaintiffs in their individual capacities.

B.     New Mexico Tort Claims Act.

Plaintiffs also have initiated a state wrongful death action pursuant to the New Mexico

Tort Claims Act. The Court exercises supplemental jurisdiction over Plaintiffs' state claims

pursuant to 28 U.S.C. Section 1367.

Defendants maintain that under New Mexico's Wrongful Death Statute only Louise

Murphy in her capacity as personal representative may bring a state wrongful death action, and

that the claims by Plaintiffs in their individual capacities must be dismissed as a matter of law.

*See* N.M. Stat. Ann. § 41-2-3. Section 41-2-3 provides in relevant part, "Every action mentioned

[in the Wrongful Death Act] shall be brought by and in the name of the personal representative of

the deceased person." N.M. Stat. Ann. § 41-2-3. Plaintiff Murphy in her capacity as personal

representative is the only Plaintiff with standing to bring a state wrongful death claim. *Cf.*

*Henkel v. Hood*, 49 N.M. 45, 52, 156 P.2d 790, 794 (N.M. 1945); *see also Solon v. WEK Drilling Co.*, 113 N.M. 566, 568 (N.M. Ct. App. 1992) ("Under Section 41-2-3, every action under our wrongful death act is to be brought by the personal representative of the decedent"). Therefore, Plaintiffs in their individual capacities do not have standing to assert a state wrongful death action, and the Court dismisses their pendent wrongful death claims.

II.    <u>Does Qualified Immunity Protect Defendants in Their Individual Capacities From Plaintiffs' 42 U.S.C. Section 1983 Claims for Excessive Police Force?</u>

Plaintiff Murphy, personal representative of decedent's estate ("Estate"),[7] argues that Defendants Bitsoih and Etheredge used unlawful excessive force in violation of the Fourth Amendment, and that the Estate therefore is entitled to relief under 42 U.S.C. Section 1983.[8] Section 1983 provides civil redress for deprivation of constitutional rights by persons acting under color of state law.[9] *See Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995); 42 U.S.C. §

_____

[7] The Court has dismissed the Section 1983 claims brought by all Plaintiffs except Louise Murphy, personal representative of the estate of Benson Murphy. *See supra* § I.A.2. The Court therefore will refer only to the Estate's Section 1983 claims.

[8] Upon its review of the record in this case, the Court became aware of certain discrepancies between Plaintiffs' claims set forth in the Complaint, the Pre-Trial Report, and the responsive summary judgment memorandum. Accordingly, on April 21, 2004, the Court issued an Order seeking clarification of Plaintiffs' claims **[Doc. No. 52]**. In response to this Order, Plaintiffs indicated, among other things, that they did not intend to pursue any claims against Defendant McDonald, either in his individual or official capacity, because "it is clear that there exist no claims against Defendant McDonald"**[Doc. No. 53]**. On summary judgment, Defendant McDonald argued that there is an absence of evidence to support Plaintiff's claims against him. Plaintiff has conceded as much. The Court therefore grants summary judgment in Defendant McDonald's favor and dismisses all claims against him contained in the Complaint.

[9] Section 1983 provides in relevant part, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the

1983. Section 1983 was enacted "to provide protection to those persons wronged by the misuse of power." *Owen v. City of Independence*, 445 U.S. 622, 650 (1980) (citations omitted). Because "Section 1983 creates no substantive civil rights, but rather only a procedural mechanism for enforcing them," the Court's analysis focuses on the alleged violation of the Fourth Amendment. *Wilson*, 52 F.3d at 1552 (citation omitted); *Graham v. Connor*, 490 U.S. 386, 393-94 (1989).

Defendants raise qualified immunity as a defense to the Estate's allegations of excessive force. Defendants' motion for summary judgment implies that Defendants Bitsoih and Etheredge are entitled to qualified immunity in both their official and individual capacities. The Supreme Court, however, has frequently noted, "municipalities do not enjoy immunity from suit-either absolute or qualified--under § 1983," *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993), and the "only immunities available to the defendant in an official-capacity action are those that the governmental entity possesses," *Hafer v. Melo*, 502 U.S. 21, 24 (1991). Accordingly, Defendants Bitsoih and Etheredge are not entitled to qualified immunity in their official capacities. They may, however, raise the defense in their individual capacities.

A.    Violation of a Constitutional Right.

Because Defendants (in their individual capacities) have raised a qualified immunity defense, the Court must evaluate the merits of the defense under the modified summary judgment standard that applies to public officials who assert qualified immunity. *See, e.g., Garramone v.*

---

party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

*Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996).  To determine whether the Estate has satisfied the

first part of its burden under this standard by establishing a constitutional violation, the Court

must look to the substantive law in effect at the time the conduct in question occurred.  *See*

*Saucier v. Katz*, 533 U.S. 194, 199 (2001).  In *Graham v. Connor*, decided in 1989, the Supreme

Court held that the use of excessive force during arrest violates a person's Fourth Amendment

right against unreasonable search and seizure, and that all excessive force claims should be

analyzed under the reasonableness standard of the Fourth Amendment.[10]  *See* 490 U.S. 386, 395

(1989).  The analysis set forth in *Graham* is still in effect today and therefore is the standard

under which the Court must assess the officers' conduct.  *See, e.g., Saucier*, 533 U.S. at 202;

*Medina v. Cram*, 252 F.3d 1124, 1131 (10th Cir. 2001).

　　　The Fourth Amendment reasonableness inquiry is objective and heavily fact dependent.

*See, e.g., Wilson*, 52 F.3d at 1553.  It also recognizes that the "'reasonableness' of a particular

use of force must be judged from the perspective of a reasonable officer on the scene, rather than

with the 20/20 vision of hindsight, . . . [and it] must embody allowance for the fact that police

officers are often forced to make split-second judgments . . . in circumstances that are tense,

uncertain, and rapidly evolving."  *Graham*, 490 U.S. at 396-97.  "'[T]he reasonableness of [an

officer's] actions depends both on whether [the officer was] in danger at the precise moment that

. . . force [was used] and on whether [the officer's] own reckless or deliberate conduct during the

seizure unreasonably created the need to use such force.'"  *Allen*, 119 F.3d at 840 (quoting *Sevier*

---

[10]Although the Complaint does not specify what constitutional right serves as the basis of
the Section 1983 claim, the Court will interpret the Complaint in the light most favorable to the
Estate and assume the Estate intended to allege a violation of the Fourth Amendment.

*v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995)). Accordingly, a court can consider both an officer's conduct at the time of the incident, and his or her "conduct prior to the suspect's threat of force," provided that "the conduct is 'immediately connected' to the suspect's threat of force." *Id.* (citations omitted). A court must pay careful attention to the totality of the facts and circumstances of each particular case, including the severity of the crime at issue, whether the subject poses an immediate threat to the safety of the officer, and whether the subject is resisting arrest by flight. *See Graham*, 490 U.S. at 396 (citation omitted).

In this case, the Estate makes several allegations and identifies various specific facts in the record regarding the reasonableness of the actions of Officers Bitsoih and Etheredge. Specifically, the Estate points to evidence indicating that decedent was not carrying a knife at the time Officers Bitsoih and Etheredge shot him, and that the police planted the knife allegedly found on decedent's person after the shooting. The Estate further contends that certain evidence shows that decedent did not lunge at the police or otherwise exhibit violent or aggressive conduct toward the police. The Estate also argues that decedent was approximately fifteen feet away from the officers when he was shot in excess of five times by the officers with high-powered weapons. In addition, the Estate maintains, and Defendants do not affirmatively dispute, that the evidence shows (i) decedent did not verbally threaten the police but rather only demanded that the police kill him, (ii) decedent was intoxicated, (iii) the officers knew decedent was attempting to commit "suicide by cop" and nonetheless shot-to-kill decedent, and (iv) the police knew Officer Vigil had encountered decedent earlier in the week regarding a similar incident and that a violent response had not been necessary at that time. The Estate points out that, despite these circumstances, the police opted to shoot-to-kill decedent rather than use additional, non-lethal

-19-

means of subduing him, and Defendant Etheredge fired lethal shots at decedent prior to seeing the effect of one shot from Defendant Bitsoih.[11] In addition, the Court notes that the police did not give warning to decedent prior to using deadly force, and the officers did not approach decedent cautiously, but rather with their weapons on display and their voices shouting out commands.

The Court must accept as true the facts alleged by the Estate, *cf. Saucier*, 533 U.S. at 201, and determine whether under *Graham* the Estate has established an excessive force violation of the Fourth Amendment. The first *Graham* factor weighs in favor of the Estate because Mr. Murphy was not committing any relatively severe crime.[12] *Cf. Graham*, 490 U.S. at 396 (severity of crime is a factor to consider under reasonableness analysis). It is undisputed that the officers were called to protect decedent from hurting himself and not from hurting someone else or committing another criminal act.

The second *Graham* factor also weighs in the Estate's favor. Under the facts alleged by the Estate, decedent did not pose an immediate threat to the safety of the officers. *Cf. Graham*, 490 U.S. at 396 (whether the subject poses an immediate threat is a factor to consider under the reasonableness test). No reasonable officer could believe that an unarmed person, who previously had not posed a threat to officers, standing approximately fifteen feet away, who did

---

[11] The Estate also contends that Defendant Bitsoih did not wait to see the effect of the beanbag rounds fired by Sergeant McDonald. The Estate, however, points to no evidence in the record to support this contention. Accordingly, the Court will not consider the allegation.

[12] In New Mexico, suicide is not a crime. *See, e.g., Harrell v. City of Belen*, 93 N.M. 612, 617, 603 P.2d 722, 727 (N.M. Ct. App.), *rev'd on other grounds*, 93 N.M. 601, 603 P.2d 711 (N.M. 1979).

not lunge at or take any other aggressive action towards the officers but rather only made threatening statements toward himself, posed a serious threat. *Cf., e.g., Diaz v. Salazar*, 924 F. Supp. 1088, 1094-95 (D.N.M. 1996) (denying summary judgment to officers summoned to deal with intoxicated and disorderly plaintiff because, even though plaintiff wielded a knife between one and six feet from the officers, the knife may have been held in an upward direction, and plaintiff refused to drop the knife, there was no evidence that plaintiff lunged at or otherwise represented an immediate threat to the officers); *Archuleta v. Lacuesta*, 128 N.M. 13, 16-17, 988 P.2d 883, 886-87 (N.M. Ct. App. 1999) ("[i]f [the suspect] did not make any threatening motion toward [the] [o]fficer . . . or if [the] [o]fficer . . . was twelve yards away from [the suspect], a jury could reasonably conclude that [the] [o]fficer . . . did not have probable cause to believe [he] was in immediate danger and that no reasonable officer could have believed that shooting [the suspect] under this factual scenario was lawful"), *cert. denied*, 128 N.M. 148, 990 P.2d 822 (1999). The fact that the officers did not take cover or retreat further demonstrates that the officers were not truly in danger. *Cf. Wilson*, 52 F.3d at 1554 (noting that courts have considered "'failure to take cover' . . . insofar as it b[ears] upon whether the officer's life was truly in danger"); *Quezada v. County of Bernalillo*, 944 F.2d 710, 717 (10th Cir. 1991) (same). In addition, the Estate alleges that decedent posed even less of a potential threat at the time Defendant Etheredge fired three shots, because decedent already had been shot twice from a beanbag gun and at least one time by Defendant Bitsoih's lethal weapon. Defendant Etheredge, however, did not wait to see the effect of Defendant Bitsoih's lethal shots on Mr. Murphy prior to firing his own weapon three times.

Under the third *Graham* factor, decedent was not resisting arrest by attempting to flee the

-21-

scene. *Cf. Graham*, 490 U.S. at 396 (whether suspect is evading arrest by attempting to flee the scene is a factor to consider in determining reasonableness). Furthermore, the primary focus of the Court's reasonableness inquiry "must remain on whether the officer was in danger at the exact moment of the threat of force." *Medina*, 252 F.3d at 1132. Here, the Estate alleges, and identifies facts in support of its allegation, that the officers were not in danger.

Under *Graham*, the Estate has established a Fourth Amendment violation. It bears mentioning, however, that the reasonableness of an officer's conduct also can depend upon whether the officer's own deliberate or reckless conduct unreasonably created the need to use deadly force. *See, e.g., Allen*, 119 F.3d at 840. *But see Medina*, 252 F.3d at 1132 (the primary focus is whether the officer was in danger). In this case, a reasonable jury could find that Defendants' conduct precipitated the need for lethal force. In *Allen v. Muskogee*, for example, the Tenth Circuit denied summary judgment to officers using deadly force against a suicidal suspect who pointed a gun at two officers because a reasonable jury could have found that the officers' actions were objectively unreasonable and reckless. *See* 119 F.3d at 841. In *Allen*, the officers approached the suspect, who was sitting in his car with a gun in his hand resting on the center console. *See id.* at 839. Certain evidence indicated that officers approached the suspect while screaming and shouting at him to get out of the car. *See id.* at 841. Other evidence indicated that the officers approached the suspect cautiously and tried talking the suspect into turning his gun over to the police. *See id.* In determining whether the City should be held liable for the officers' conduct, the Court cited expert testimony indicating that officers should never leave cover and approach an armed suicidal person to try to disarm him, and that "walk[ing] up to the situation, stand[ing] in the open, [and] trying to grab the gun" is "just reckless behavior."

-22-

*Id.* at 843. The court found that a reasonable jury could find that the officers' conduct precipitated the need for deadly force, and therefore denied the summary judgment motion brought by the officers and the city. *See id.* at 841.

In this case, the evidence indicates that the officers approached decedent with their weapons visible while the officers were walking out in the open and shouting commands at decedent. A reasonable jury could find that the officers' conduct of approaching decedent in an aggressive manner rather than taking cover constituted reckless conduct that precipitated the need to use deadly force. *Cf. id.*

Although the facts disputed by Defendants are not relevant to a qualified immunity analysis, it is worth noting that Defendants' own testimony is internally inconsistent and supports the Estate's claims in part. For example, although Sergeant McDonald maintains that decedent was holding a knife, he nonetheless reinforces the Estate's claim that decedent was not aggressive or threatening. Although Defendants Bitsoih and Etheredge contend that decedent was approaching briskly and in an aggressive and violent manner, Sergeant McDonald states that decedent was merely "taking steps" toward, "approaching," or "clos[ing] the distance." Sergeant McDonald does not characterize decedent as aggressive, violent, or threatening toward the officers. In fact, nowhere in the evidence submitted on summary judgment does Sergeant McDonald indicate that he feared for his life or that it was necessary under the circumstances to take lethal action toward decedent. *Cf., e.g., Diaz*, 924 F. Supp. at 1094 (knife without additional aggressive conduct does not render a suspect an immediate threat). A jury could conclude that Sergeant McDonald's failure, and the failure of his fellow officers, to take cover or retreat confirms this fact. *Cf. Wilson*, 52 F.3d at 1554. Additionally, although Defendants Bitsoih and

-23-

Etheredge contend that decedent was holding a knife, Defendant Bitsoih testified that decedent was holding the knife blade up in a threatening manner, while Defendant Etheredge initially stated that decedent was holding the knife blade down. *Cf. id.* at 1553 (considering whether decedent held gun in a downward surrender position as part of the reasonableness inquiry); *Diaz*, 924 F. Supp. at 1091 n.1 (considering whether suspect held knife in a downward position). Therefore, even if the Estate had not alleged the officers planted the knife, under the evidence viewed in the light most favorable to the Estate, a reasonable jury could find that decedent did not pose an immediate threat to defendants, and that the officers therefore used excessive force.

The cases cited by Defendants do not persuade the Court otherwise. Defendants argue that clearly established law grants police officers the right to use deadly force to stop a suspect with a knife who is in "arms length." As the Estate points out, however, the cases cited by Defendants and the law in this Circuit require more than a suspect holding a knife near a police officer to justify a killing. *Cf. Diaz*, 924 F. Supp at 1094 (explaining that "[a]lthough a knife is a deadly weapon, its mere status as such does not create the justification for the use of deadly force"). In many of the cases cited by Defendants in which the courts found the use of deadly force objectively reasonable, the suspects were either immediately upon, or one to two feet from, the officers, and the suspects actively lunged toward, swung at, or struck the officers. *See, e.g., Romero v. Board of County Comm'rs*, 60 F.3d 702, 704 (10th Cir. 1995) (suspect punched officer in the nose, ran a knife across the officer's stomach, with knife in hand pursued the officer as he retreated, and continued toward the officer even after being fired upon once), *cert. denied*, 516 U.S. 1073 (1996); *Reynolds v. County of San Diego*, 84 F.3d 1162, 1168 (9th Cir. 1996) (suspect armed with a knife suddenly swung with knife in hand at an officer who was standing

immediately behind the suspect), *overruled in part on other grounds by Acri v. Varian Assocs., Inc.*, 114 F.3d 999 (9th Cir. 1997); *Roy v. Inhabitant of the City of Lewiston*, 42 F.3d 691, 693, 694 (1st Cir. 1994) (suspect armed with a steak knife in each hand lunged at officers standing two feet away).

In other cases cited by Defendants, the suspects were six to eight feet from the officers, but they also exhibited aggressive conduct, such as charging or rushing toward the officers. *See, e.g., O'Neal v. DeKalb County*, 850 F.2d 653, 655, 657-58 (11th Cir. 1988) (extremely dangerous suspect had just stabbed and seriously injured several people and charged with a knife over his head toward officers standing six feet away); *Wood v. City of Lakeland*, 203 F.3d 1288, 1292-93 (11th Cir. 2000) (suicidal suspect armed with a box cutter shouting profanity directly at officers, while seated on top of a dresser, slid off the dresser "real quick" with forward momentum toward an officer who was six to eight feet away).

Although the remaining cases cited by Defendants indicate deadly force could be objectively reasonable where a suspect was approximately ten to fifteen feet away, aggressive conduct in conjunction with proximity nonetheless was a necessary factor. In *Archuleta v. LaCuesta*, for example, the New Mexico Court of Appeals stated that if a suspect-decedent in possession of a knife "was not making any threatening gesture toward the officers when he was shot, a reasonable officer in [the] position [of the officers] would not have probable cause to believe that [the decedent] posed a significant threat of death or serious injury." 128 N.M. 13, 16, 988 P.2d 883, 886 (N.M. Ct. App.), *cert. denied*, 128 N.M. 148, 990 P.2d 822 (1999). The court refused to grant summary judgment because there was a factual dispute as to both the distance of the suspect from the officer and whether the suspect actually lunged at the officer.

-25-

*See id.* at 17, 988 P.2d at 887 (officer was ten or more feet from suspect). In *Sigman v. Town of Chapel Hill*, although the Fourth Circuit held that the use of deadly force was objectively reasonable to stop an intoxicated and volatile suspect armed with a knife who walked to within ten to fifteen feet of the officers, the officers knew in advance that the suspect was willing to use the knife against them because the suspect had just attempted to stab one of the officers through an open window. *See* 161 F.3d 782, 787 (4th Cir. 1998). The suspect also had threatened the officer's life. *See id.*

B.      Clearly Established.

Because the Court has held that the facts alleged by the Estate establish a constitutional violation of decedent's rights, the Court must consider next whether the right violated was a clearly established right. *See Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). Although "there is no doubt that *Graham v. Connor*, 490 U.S. 386 (1989), clearly establishes the general proposition that the use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness," *id.* at 202, "'the right [officers are] alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635 (1987)). Therefore, "the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his [or her] conduct was unlawful in the situation he [or she] confronted." *Id.* (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). The Tenth Circuit has held that for a right to be "particularized," there "ordinarily . . . must be a Supreme Court or Tenth Circuit opinion on

-26-

point." *Garramone v. Romo*, 94 F.3d 1446, 1451 (10th Cir. 1996). "[T]he very action in question[, however, need not have] previously been held unlawful" for a plaintiff to defeat qualified immunity. *Anderson v. Creighton*, 483 U.S. 635 (1987).

In this case, the Estate has established the second part of its burden by demonstrating that the right to be free from excessive police force is "clearly established" in the "more particularized sense" required by Supreme Court precedent. *Cf. Saucier*, 533 U.S. at 202. Specifically, the "contours of the right" to be free from excessive police force are "sufficiently clear that a reasonable off[icer]" in the position of Defendants Bitsoih and Etheredge would have "underst[ood] that what he [or she was] doing"--*e.g.*, shooting an allegedly unarmed and unthreatening individual--violates that right. *See id.* (citation and internal quotations omitted). Police Chief Galvin conceded that it would not be proper for the officers to shoot an unarmed man. It also is a well-settled and long-standing principle that the use of deadly force on an unarmed and unthreatening suspect constitutes unreasonable excessive force under the Fourth Amendment. *Cf. Saucier*, 533 U.S. at 208 (considering as part of its "clearly established" analysis whether the law in question was long standing).

Even absent the allegations that decedent Murphy was unarmed, no reasonable officer could have believed that the use of deadly force was lawful under the circumstances alleged by the Estate. In the cases previously discussed, *see supra* § II.A, the courts uniformly required more than the mere presence of a knife near an officer to justify the use of lethal force. *See Diaz*, 924 F. Supp. at 1094; *Archuleta*, 128 N.M. at 16-17, 988 P.2d at 886-87. Courts have specifically required the presence of a knife in addition to aggressive and threatening conduct reasonably placing an officer in fear for his or her life or the lives of others. On the facts viewed

-27-

in a favorable light to the Estate, the decedent did not exhibit aggressive or threatening conduct.

Clearly established law in this Circuit also holds that an officer is responsible for his or her reckless conduct that precipitates the need to use force. In *Allen v. Muskogee*, for example, the Tenth Circuit denied summary judgment to officers using deadly force against a suicidal suspect who pointed a gun at two officers. *See* 119 F.3d 837, 841 (10th Cir. 1997). The Tenth Circuit held that a reasonable jury could have found that the officers' conduct in approaching the suspect was objectively unreasonable, reckless, and could have precipitated the need to use deadly force. *See id.*

Furthermore, under clearly established law, an officer's knowledge about the degree of threat a suspect potentially poses is relevant to the reasonableness inquiry. *Compare Saucier*, 533 U.S. at 208-09 (considering as part of its "clearly established" analysis, the fact that officers had just come into contact with suspect and did not know the full extent of the threat he posed). In this case, the officers dispatched to Mr. Murphy's house had prior contact with him and information about the severity of the threat he potentially posed. Specifically, the Estate alleges that the officers knew Mr. Murphy was attempting to commit suicide by cop and that he was not threatening anyone else. They also knew he had not posed a threat to Officer Vigil earlier that same week.[13]

Under the circumstances alleged by the Estate, a reasonable officer in Defendants' position should have understood that the use of lethal force would violate the Fourth

---

[13] Although the 911 transcript indicates that an unidentified male voice stated he was "ready to kill a cop," *see supra* note 2, Defendants make no claim, and the evidence does not show, that any of the officers on site were aware that such a statement was made.

Amendment. The Estate therefore has satisfied both the first and second parts of its burden to overcome Defendants' assertion of qualified immunity.

C.      Material Factual Dispute

Because the Estate successfully has alleged facts that demonstrate a violation of a clearly established right, Defendants must assume the normal summary judgment burden of establishing that there is no genuine issue of material fact in dispute that would defeat their claims for qualified immunity. *See, e.g., Woodward v. City of Worland*, 977 F.2d 1392, 1396-97 (10th Cir. 1992) (citations omitted), *cert. denied sub nom. Woodard v. Seghetti*, 509 U.S. 923 (1993). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Allen*, 119 F.3d at 841 (citing *Anderson*, 477 U.S. at 248).

As previously described herein, the parties dispute the following material facts: (i) whether decedent was in possession of a knife, (ii) if decedent did posses a knife, whether he held the knife blade up or down, (iii) whether decedent was walking briskly and aggressively toward the officers or whether he was merely "taking steps," (iv) whether decedent was waiving his arms in an aggressive manner toward the officers, (v) whether Defendant Etheredge waited to see the effect of Defendant Bitsoih's shots prior to firing, and (vi) whether decedent made any threatening or aggressive gesture toward the officers that reasonably would place them in fear for their lives. These disputes are both material and genuine, and a reasonable jury could conclude that the officers' actions were unreasonable under the circumstances. Accordingly, the Court denies Defendants Bitsoih and Etheredge's motion for summary judgment on the grounds of qualified immunity.

-29-

III.   Are Defendants Entitled to Summary Judgment on the Remaining Section 1983 Claims?

Defendants also move for summary judgment on the Estate's remaining Section 1983 claims. The Estate maintains that Defendants Galvin, Bitsoih, and Etheredge in their official capacities[14] and Defendant City of Albuquerque established a policy or custom of condoning or encouraging the use of excessive police force. The Estate further alleges that Defendant Galvin in his official capacity and Defendant City of Albuquerque failed to supervise, hire, and train Officers Bitsoih and Etheredge adequately.

The Court first will address the legal standard for establishing liability on a Section 1983 official or municipal liability claim. The Court then will address the Estate's ability to withstand summary judgment on each of its claims. In conducting its summary judgment evaluation, the Court will analyze the Estate's municipal and official capacity claims together because under the law "an official-capacity suit is in all respects, other than name, . . . a suit against the entity.'" *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).

A.     Establishing Municipal (and Official) Liability.

A municipality such as the City of Albuquerque is not immune from a Section 1983 suit. In *Monell v. New York City Department of Social Services*, the Supreme Court held that municipalities and other local governmental bodies are "persons" within the meaning of Section 1983. *See* 436 U.S. 658, 689 (1978). Although courts can impose civil liability on

_____

[14] In response to the Court's April 21, 2004, Order seeking clarification of the claims Plaintiffs are pursuing **[Doc. No. 52]**, *see supra* note 8, Plaintiffs indicated that they are not pursuing any claims against Defendant Galvin in his individual capacity. Accordingly, the Court grants summary judgment on all claims contained in the Complaint against Defendant Galvin in his individual capacity.

-30-

municipalities for their own illegal acts, the Supreme Court repeatedly has refused to hold municipalities liable for the tortious acts of their employees under a theory of *respondeat superior. See, e.g., id.; see also Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (citation omitted).

The Supreme Court has concluded that municipalities can be held liable only when an injury is inflicted by the government's "'lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 117 (1988) (quoting *Monell*, 436 U.S. at 694). The Court explained that requiring a plaintiff to "[l]ocat[e] a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Board of County Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997) (citation omitted). If an alleged violation "cannot be characterized as official policy then [a city] can still be held liable if the practice is 'so permanent and well settled as to constitute a custom or usage with the force of law.'" *Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir. 1996) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 168 (1970)); *see also Brown*, 520 U.S. at 403-04 ("Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."). "In order to establish a custom, the actions must be 'persistent and widespread . . . practices of city officials.'" *Lankford*, 73 F.3d at 286 (quoting *Starrett v. Wadley*, 876 F.2d 808, 818 (10th Cir. 1989)).

It is not enough for a plaintiff merely to identify conduct properly attributable to the

-31-

municipality by pointing to a policy or custom adopted or approved by an appropriate party. A plaintiff also must show that the municipality's action or inaction resulted from "deliberate indifference to the rights of the plaintiff." *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996); *see also Brown*, 520 U.S. at 407. To satisfy this culpability requirement, a plaintiff must show that the municipality's action or failure to act "reflects a 'deliberate' or 'conscious' choice by a municipality." *City of Canton v. Harris*, 489 U.S. 378. 389 (1989). A plaintiff also may satisfy the "deliberate indifference" standard by showing that "the municipality ha[d] actual or constructive notice that its action or failure to act [wa]s substantially certain to result in a constitutional violation, and it nonetheless consciously or deliberately cho[se] to disregard the risk." *Barney*, 143 F.3d at 1307. Imputation of constructive notice requires a showing that the underlying unconstitutional misconduct was "so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of it." *Jojola v. Chavez*, 55 F.3d 488, 491 (10th Cir. 1995) (citation and internal quotations omitted).

In addition to "deliberate indifference," a plaintiff also must demonstrate that "the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must . . . demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404; *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). To be the "moving force," there "must at least be an affirmative link between the . . . inadequacies alleged, and the particular constitutional violation at issue." *Oklahoma City v. Tuttle*, 471 U.S. 808, 824 n.8 (1985).

-32-

B.     Plaintiff's Official and Municipal Claims.

1.     Encouraging and Condoning Excessive Force.

The Estate alleges that Defendants Galvin in his official capacity and the City of

Albuquerque have "maintained an unwritten custom or policy [that] has permitted or condoned

the use of excessive force on citizens, and the maintenance of this unwritten custom or policy is a

direct cause of [decedent's] injuries."[15]  Defendants move for summary judgment on the Estate's

claims arguing that "Plaintiff cannot provide any evidence . . . that the . . . alleged deprivation of

the decedent's constitutional rights w[as] the result of any custom or policy."

Where, as here, a defendant has fulfilled its initial summary judgment burden of showing

there is an absence of evidence to support a plaintiff's case, the plaintiff must "go beyond the

pleadings and . . . designate 'specific facts showing there is a genuine issue for trial.'"  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)).   In this case, the

Estate refers to a policy or custom of condoning excessive police force.  The Estate, however,

provides no evidence that the City or the police had an official policy of condoning the use of

excessive force.  The Court therefore will determine whether the Estate has identified facts

establishing a custom of encouraging excessive force.

The only incident involving the alleged use of excessive force cited by the Estate is the

---

[15] The Estate also alleges that Defendants Bitsoih and Etheredge are liable in their official
capacities for their use of excessive force.  Because a claim against individuals in their official
capacities is the same as a claim against a municipality, *cf. Kentucky v. Graham*, 473 U.S. 159,
165-66 (1985), the Court will address the Estate's official capacity claims against Defendants
Bitsoih and Etheredge along with the Estate's claims that the City of Albuquerque and Police
Chief Galvin in his official capacity maintained a policy or custom of condoning and
encouraging the use of excessive police force.  The Court shall sometimes collectively refer
herein to Defendants in their official capacities and the City of Albuquerque as the "City."

shooting of decedent. Consistent with the commonly understood meaning of "custom," proof of random acts or isolated incidents is not sufficient to show the existence of a custom. *See Praprotnik*, 485 U.S. at 131 (Brennan, J., concurring). As the Tenth Circuit has explained, a city can be held liable if a practice is "'so permanent and well settled as to constitute a custom or usage with the force of law.'" *Lankford*, 73 F.3d at 286 (quoting *Adickes*, 398 U.S. at 168). In order to establish a custom, the actions must be a "persistent and widespread . . . . practice of [a city's] employees." *Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993) (citation omitted). By identifying facts regarding only a single incident, the Estate has not demonstrated the existence of a persistent and widespread practice and therefore has not established a custom of encouraging or condoning the use of excessive police force. *Cf. Starrett v. Wadley*, 876 F.2d 808, 820 (10th Cir. 1989) ("isolated and sporadic acts of sexual harassment directed at a few specific female members of [the] staff" does not amount to a "persistent and widespread practice").

The Estate also has not satisfied its burden of demonstrating culpability and causation. Indeed, the Estate has not even alleged that the custom identified amounts to "deliberate indifference." Under the law, a plaintiff must identify facts that demonstrate a municipality's actions in maintaining a custom--here, an alleged custom of condoning and encouraging the use of excessive force--constituted deliberate indifference by the City towards its citizens' interests. *Cf. Brown*, 520 U.S. at 404, 407. Although the Estate could, in the alternative, identify facts showing that the City had actual or constructive notice that its action or failure to act was substantially certain to result in a constitutional violation, *cf. Barney*, 143 F.3d at 1307, the Estate has failed to do so.

-34-

Likewise, the Estate alleges, but has not provided any specific facts showing, that the custom identified was the moving force behind the officers' use of excessive force against decedent Murphy. *Cf. Brown*, 520 U.S. at 404. Although the Estate argues that its custom of condoning the use of excessive force "is a direct cause" of decedent's injuries, the Estate identifies no specific facts showing that the policy or custom contributed or was affirmatively linked to decedent's death. *Cf. Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir.), *cert. denied*, 506 U.S. (1992); *City of Oklahoma v. Tuttle*, 471 U.S. 808, 824 n.8 (1985).

The Supreme Court has held, "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Brown*, 520 U.S. at 405 (citing *Canton*, 489 U.S. at 391-92) (additional citations omitted). The Estate has not satisfied this stringent standard. Accordingly, Defendants are entitled to judgment as a matter of law in their favor. *Cf. Weimer v. Schraeder*, 952 F.2d 336, 341 (10th Cir. 1991) (granting defendants' summary judgment motion on municipal liability claim because plaintiffs failed to come forward with any evidence that the city "violated decedent's due process rights through a policy or custom reflective of deliberate indifference to the rights and safety of its citizens"), *cert. denied sub nom. Weimer v. Liebner*, 505 U.S. 1210 (1992). The Court therefore dismisses the Estate's claims of encouraging or condoning the use of excessive police force against Defendant City of Albuquerque and Defendants Galvin, Bitsoih, and Etheredge in their official capacities.

-35-

### 2.    Inadequate Supervision.

The Estate also alleges various violations by Defendants Galvin and the City of
Albuquerque that generally amount to claims for inadequate supervision. In order to withstand
summary judgment on its inadequate supervision claims, the Estate must identify a policy or
custom with respect to supervision that amounts to deliberate indifference and that is the moving
force behind the alleged use of excessive force by Officers Bitsoih and Etheredge sufficient to
deprive the decedent of his constitutional rights. *Cf. Romero v. Otero*, 678 F. Supp. 1535, 1538
(D.N.M. 1987) (citing *Monell* v. *New York City Dep't of Social Servs.*, 436 U.S. 658 (1978)).

The Estate has failed to do so. Although the Estate identifies two customs that arguably
relate to supervision--namely, that the City has a custom of allowing officers to ignore the chain
of command and a custom of failing to discipline its officers--the Estate has not alleged facts
sufficient to demonstrate the existence of these customs. The Estate's argument that Defendants
have a custom of allowing officers to ignore the chain of command is unavailing because the
Estate only provides evidence of a failure to follow the chain of command during the incident
involving decedent Murphy and not during any previous incidents. This evidence, standing
alone, does not establish a custom. *Cf. Lankford*, 73 F.3d at 286. The Estate's contention that
the failure to reprimand and discipline officers constitutes a *de facto* policy or a custom of
encouraging excessive force also is legally insufficient to establish conduct for which the City
may be held liable. The Estate identifies no specific facts demonstrating that the City failed to
discipline or reprimand any of its officers, including Officers Bitsoih and Etheredge. *Cf. id.*

The Estate also has not pointed to facts showing that the City acted with "deliberate
indifference" towards its citizens or that the City had actual or constructive notice that its action

-36-

or failure to act was substantially certain to result in a constitutional violation. *Cf. Barney*, 143 F.3d at 1307. In *Barney v. Pulsipher*, plaintiffs alleged that the county adopted an "official de facto policy" of permitting one jail officer to be alone on duty and failing to adopt certain policies adequately to supervise jailers and protect women prisoners. *See* 143 F.3d at 1309 n.8. The plaintiff, however, did not satisfy the deliberate indifference requirement because the "record reveal[ed] no previous incidents of sexual harassment . . . of female inmates . . . [that] would provide actual or constructive notice to the County that its one-jailer policy and failure to adopt certain policies would result in the specific injuries alleged." *Id.* The record in this case, like the record in *Barney*, reveals no evidence of a previous instance of failing to discipline or reprimand officers or of a specific failure to discipline Officers Bitsoih and Etheredge. *Cf. id.* The record also contains no evidence of a previous incident of acquiescing in a custom of allowing officers to ignore the chain of command. In fact, the minimal evidence in the record regarding chain of command offered by Police Chief Galvin is that chain of command does not preclude an individual officer from taking appropriate defensive action if the officer reasonably believes that a life is in imminent peril. The Estate therefore has not satisfied its summary judgment burden of identifying facts that establish that the City acted with deliberate indifference toward its citizens or that it had actual or constructive notice that its actions were, or its failure to act was, substantially certain to result in a constitutional violation.

The Estate also has not made any showing that the City's alleged policy of allowing officers to ignore the chain of command was the moving force behind the constitutional violation. It cannot be said that a "plainly obvious consequence" of the City's failure to enforce the chain of command would be the use of excessive force by its officers. *Cf. id.* (granting

-37-

summary judgment in municipality's favor because plaintiff could not show causation--*i.e.*, that "a plainly obvious consequence of failing to adopt such policies or having one male jailer on duty is the sexual assault of female inmates"). Although a "plainly obvious consequence" of the City's failure to discipline its officers for their use of excessive police force could be the use of excessive force against individuals like decedent, *cf. id.*, the Estate has not identified facts sufficient to establish the remaining requirements of a custom or policy or to establish deliberate indifference.

To withstand summary judgment, the Estate must come forward with evidence showing that there is a genuine issue for trial on the question of inadequate supervision. The Estate has not fulfilled this burden. Accordingly, the Court grants summary judgment in Defendants' favor and dismisses the inadequate supervision claims against the City of Albuquerque and Defendant Galvin in his official capacity. *Cf. Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (if a plaintiff does not come forward with specific facts, the moving party is entitled to judgment as a matter of law "because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof").

3.   Inadequate Hiring.

The Estate has not argued that the City's decision to hire Defendants Bitsoih and Etheredge was itself unlawful or that the City's hiring practices generally are defective. Rather, the Estate's claims are similar to that in *Board of the County Commissioners v. Brown*--*i.e.*, that a "facially lawful hiring decision . . . launch[ed] a series of events that ultimately cause[d] a violation of federal rights." 520 U.S. 397, 405 (1997). In *Brown*, the Court explained the high risks accompanying such a claim:

-38-

> Where a claim of municipal liability rests on a single decision, not itself representing a violation . . . . the danger that a municipality will be held liable without fault is high. Because the decision necessarily governs a single case, there can be no notice to the municipal decisionmaker . . . that his [or her] approach is inadequate. Nor will it be readily apparent that the municipality's action caused the injury in question, because the plaintiff can point to no other incident tending to make it more likely that the plaintiff's own injury flows from the municipality's action, rather than from some other intervening cause.

*Id.* at 408-09. The *Brown* Court explained, "To prevent municipal liability for a hiring decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged." *Id.* at 410.

"Merely showing that a municipal officer engaged in less than careful scrutiny of an applicant resulting in a generalized risk of harm is not enough to meet the rigorous requirements of "'deliberate indifference.'" *Barney*, 143 F.3d at 1308. "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his [or her] action." *Brown*, 520 U.S. at 410. In the context of a facially neutral hiring decision, culpability requires a strong connection between the background of the particular applicant and the specific constitutional violation alleged. *See Barney*, 143 F.3d at 1308. Establishing municipal liability in the hiring context requires a finding that "this officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Brown*, 520 U.S. at 412 (emphasis in original).

To determine whether Defendants are entitled to summary judgment on the Estate's inadequate hiring claims, the Court must test the link between the City's hiring decision and the Estate's injury. Specifically, the Court must ask whether a reasonable jury could find, on the

facts presented in the light most favorable to the Estate, that a full review of the records of

Officers Bitsoih and Etheredge would have revealed that a plainly obvious consequence of the

hiring decision would be the officers' use of excessive force. *Cf. id.* at 412-13.  On this point, the

Estate's showing is inadequate.  In fact, the Estate did not come forward with any evidence

regarding the records of Officers Bitsoih and Etheredge.  Rather, the Estate set forth conclusory

allegations with respect to the actions and conduct of the officers at the time of the shooting--

information that was not available to Defendants at the time the officers were hired.  Because the

Estate has not fulfilled its summary judgment burden of designating specific facts showing that

there is a genuine issue for trial, the Court grants summary judgment to Defendants and

dismisses the Estate's inadequate hiring claim.  *Cf. id.* (finding in favor of defendant sheriff on

inadequate hiring claim because plaintiff failed to set forth sufficient evidence on which a jury

could base a finding that the sheriff's decision to hire reflected a conscious disregard of an

obvious risk that a use of excessive force would follow); *Barney*, 143 F.3d at 1309 (finding in

favor of defendant because "plaintiffs . . . presented no evidence that officer's background could

have led [the s]heriff . . . to conclude [the officer] was highly likely to inflict sexual assault on

female inmates if hired").

### 4.    Inadequate Training.

The Estate has alleged Section 1983 claims based on inadequate police training against

Defendants Galvin in his official capacity and the City of Albuquerque.  The Supreme Court has

held that under certain circumstances inadequate training may constitute city policy.  In *City of

Canton v. Harris*, the Court explained that "in light of the duties assigned to specific officers . . .

the need for more or different training [may be] so obvious, and the inadequacy so likely to result

-40-

in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." 489 U.S. 378, 390 (1989). In such cases, the failure to provide proper training may represent a policy for which the City is responsible. *See id.*

Inadequacy of police training may serve as a basis for Section 1983 liability only when the failure to train reflects a municipality's deliberate indifference to the rights of people with whom the police come into contact. *See Allen v. Muskogee*, 119 F.3d 837, 841 (10th Cir. 1997) (quoting *Canton*, 489 U.S. at 388), *cert. denied sub nom. Smith v. Allen*, 522 U.S. 1148 (1998). Failure to train officers regarding the use of deadly force can amount to "deliberate indifference" when it is plainly obvious and "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons" and use lethal force. *Id.* at 842 (quoting *Canton*, 489 U.S. at 390 n.10).

Courts have held that it is possible to establish "deliberate indifference" by identifying a single constitutional violation. *See, e.g., Barney*, 143 F.3d at 1307-08. In *Allen v. Muskogee*--a case factually analogous to this case--the Tenth Circuit held that to establish "deliberate indifference" with only a single violation,

> a plaintiff must show (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a[n] usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact; and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Allen*, 119 F.3d at 841-42 (citing *Zuchel v. City and County of Denver*, 997 F.2d 730, 734-35

(10th Cir. 1993); *Canton*, 489 U.S. at 389-91).

In this case, admittedly, the record contains few "'specific facts showing that there is a genuine issue for trial'" on the inadequate training claims. *Cf. Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Plaintiff's failure to provide such information, however, is not fatal because Defendants did not satisfy their initial summary judgment burden "of 'showing' . . . that there is an absence of evidence to support the nonmoving party's case.'" *Id.* at 325. Specifically, Defendants did not raise their failure to train claims on summary judgment, *see supra* note 4, and therefore did not satisfy their burden. Accordingly, the Court denies summary judgment on the Estate's inadequate training claims against Defendants Galvin in his official capacity and the City of Albuquerque. The Court, however, grants Defendants leave to file a motion for partial summary judgment and memoranda in support thereof on the failure to train claims.

IV.     Were Defendants Bitsoih and Etheredge Privileged to Use Deadly Force under New Mexico Law?

In addition to bringing federal claims against Defendants Bitsoih and Etheredge for the use of excessive force, the Estate also brings pendent state civil battery claims under the New Mexico Wrongful Death Act against Defendants Bitsoih and Etheredge.[16] The Estate brings its

---

[16] In response to the Court's April 21, 2004, Order seeking clarification of the claims Plaintiffs are pursuing, *see supra* note 8, the Estate indicated that it also is pursuing a battery claim against the City of Albuquerque, presumably under a *respondeat superior* theory. In its memoranda supporting its motion for summary judgment, however, the City failed to satisfy its initial summary judgment burden "of 'showing' . . . that there is an absence of evidence to support," *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), the Estate's claim that the City should be held liable for the actions of Officers Bitsoih and Etheredge, *cf. Weinstein v. City of Santa Fe*, 121 N.M. 646, 651-52, 916 P.2d 1313, 1318-19 (N.M. 1996) (setting forth the standard to establish *respondeat superior* liability). Because the City did not fulfill its initial summary judgment burden in this regard, the Court denies the City's summary judgment motion on these claims. The Court, however, grants the City of Albuquerque leave to file a motion for partial

battery and wrongful death claims against Defendants Bitsoih and Etheredge in their individual and official capacities. The "distinction between a state official in an official capacity and a state official in an individual capacity" turns on "procedural considerations and the relief sought." *Ford v. New Mexico Dep't of Public Safety*, 119 N.M. 405, 410, 891 P.2d 546, 551 (N.M. Ct. App. 1994), *cert. denied*, 119 N.M. 354, 890 P.2d 807 (N.M. 1995) . In essence, a suit against an official in his official capacity is a suit against the municipality; a suit against an official in his individual capacity is a suit seeking damages from the individual and not the municipality. *See id.* at 411, 891 P.2d at 552. Because the only distinction between the state claims against the officers in their individual and official capacities is the relief sought, the Court will analyze the merits of these claims on summary judgment together.[17]

An actor is subject to civil liability for battery if "'he [or she] acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and . . . an offensive contact with the person of the other directly or indirectly results.'" *State v. Ortega*, 113 N.M. 437, 440, 827 P.2d 152, 155 (N.M. Ct. App.

_____

summary judgment and memoranda in support thereof on the Estate's state law battery claim.

[17] Defendants are not entitled to immunity against these claims under the New Mexico Tort Claims Act (NMTCA) because Defendants have waived their immunity under the Act. The "Tort Claims Act grants immunity from tort liability to governmental entities and public employees acting within the scope of duty except as waived by specific provisions of the Act." *Dunn v. McFeeley*, 984 P.2d 760, (N.M. Ct. App.1999) (citation omitted). Section 41-4-12 of the Act, however, provides that law enforcement officers may waive their right to immunity for "personal injury, bodily injury, [or] wrongful death . . . resulting from assault, battery, [or] deprivation of any rights, privileges or immunities secured by the constitution." N.M. Stat. Ann. § 41-4-12. Here, the Estate alleges that Defendants waived their immunity by inflicting injury resulting from battery and deprivation of decedent's constitutional rights. Therefore, under Section 41-4-12, Defendants have waived their rights to immunity.

1992) (quoting Restatement (Second) of Torts § 18 (1965)). The parties do not dispute that Defendants Bitsoih and Etheredge intended to shoot decedent and therefore commit a battery against him. Defendants maintain, however, that they were privileged to use deadly force pursuant to New Mexico Statutes Annotated Section 30-2-6, which grants police officers immunity from criminal homicide charges under certain circumstances. Section 30-2-6 provides in relevant part, "Homicide is justifiable when committed by a public officer" if it is, among other things, "necessarily committed in overcoming actual resistence to . . . the discharge of any other legal duty." N.M. Stat. Ann. § 30-2-6. A homicide is "necessarily committed" "when a public officer . . . has probable cause to believe [s/]he or another is threatened with serious harm or deadly force while performing those lawful duties described in [Section 30-2-6]." *Id.* Section 30-2-6 provides law enforcement officers with a wider scope of privilege than the general public with regard to the use of deadly force in self-defense.[18] *See State v. Mantelli*, 131 N.M. 692, 700, 42 P.3d 272, 280 (N.M. Ct. App. 2002), *cert. denied*, 131 N.M. 737, 42 P.3d 842 (N.M. 2002).

Section 30-2-6 is inapplicable here as a matter of law, however, for two separate reasons. First, this is a civil case, and Defendants cite no authority, and the Court can find no authority, authorizing the application of the defense to a criminal homicide charge contained in Section 30-2-6 to a civil case alleging the tort of battery and wrongful death. Second, the Estate argues, and

---

[18] For example, the "immediacy" requirement necessary for self-defense or defense of others does not appear in Section 30-2-6. *See State v. Mantelli*, 131 N.M. 692, 700, 42 P.3d 272, 280 (N.M. Ct. App. 2002). Further, Section 30-2-6(B) states that a law enforcement officer may use deadly force if he or she has "probable cause to believe [s/]he or another is threatened with serious harm," while an individual claiming self-defense must demonstrate she or he faces "apparent danger of immediate death or great bodily harm." *Id.* at 700-01, 42 P.3d at 280-81 (quoting N.M. UJI 14-5171).

Defendants do not disagree, that Section 30-2-6 is inapplicable because a homicide by an officer is justifiable *only if* it was committed while the officer was performing certain enumerated tasks. *See* N.M. Stat. Ann. § 30-2-6. Section 30-2-6(A)(2) expressly provides in relevant part that a homicide is justifiable when, among other things, it is "necessarily committed in overcoming actual resistance . . . to the discharge of any other legal duty." Although the Estate raises this issue on summary judgment, Defendants do not argue or make any showing in reply to indicate that Defendants Bitsoih and Etheredge shot and killed decedent Murphy to overcome resistence to the discharge of their legal duties.

Rather, the evidence indicates that Defendants were dispatched to the scene to protect decedent Murphy because he was attempting to commit "suicide by cop." As set forth above, in New Mexico, suicide is not a crime. *See Harrell v. City of Belen*, 93 N.M. 612, 617, 603 P.2d 722, 727 (N.M. Ct. App. 1979) (explaining that "the only justification for retaining [suicide] as a crime was to provide for punishing a person who aids, abets or assists another to do so," and stating that "[i]t was achieved in New Mexico by a statutory provision without the need to retain suicide as a crime"), *rev'd on other grounds*, 93 N.M. 601 (N.M. 1979), 603 P.2d 711; *see also* N.M. Stat. Ann. § 30-2-4. Defendants therefore cannot argue that decedent Murphy was committing a crime by attempting suicide. In the absence of any argument from Defendants that lethal force was necessary to "overcome[] actual resistance . . . to the discharge of [the] legal dut[ies]," this Court cannot find the statute applicable. N.M. Stat. Ann. § 30-2-6(A)(2).

Instead, the Court will evaluate Defendants' conduct under the general civil law of self-

defense and defense of others.[19]  In a civil case, the New Mexico Supreme Court explained, "[T]o justify [a] . . . battery committed by one person on another on the ground of self-defense, the person assaulted must have done some overt act or made a hostile demonstration of a character to give the assailant reasonable ground to suppose himself in imminent danger.  There is the further limitation that only such force may be used as a reasonably prudent [person] under the circumstances would believe necessary to repel the assault." *Faubion v. Tucker*, 58 N.M. 303, 306, 270 P.2d 713, 715 (N.M. 1954); *see also Downs v. Garay*, 106 N.M. 321, 324, 742 P.2d 533, 536 (N.M. Ct. App. 1987) ("the privilege of . . . self-defense[] is limited to the use of reasonable force"); *compare State v. Abeyta*, 120 N.M. 233, 239, 901 P.2d 164, 170 (N.M. 1995) (in a criminal case, the requirements for self-defense are "(1) an appearance of immediate danger of death or great bodily harm . . . , (2) the defendant was in fact put in fear by the apparent danger, and (3) a reasonable person in the same circumstances would have reacted similarly") (citations omitted), *overruled on other grounds by State v. Campos*, 122 N.M. 148, 921 P.2d 1266 (N.M. 1996).

Defendants argue that it is "undisputed that Officers Bitsoih and Etheredge believed [the] officers' lives were in imminent danger at the time they discharged their weapons." Defendants' argument is unavailing for two reasons.  First, a factual dispute exists with respect to whether the officers believed their lives were in imminent danger.  *See supra* § II.A.1.  Second, the officers' subjective beliefs are not relevant to the self-defense inquiry.  Rather, the inquiry is an objective one that asks whether a reasonable person in the officers' position would have believed it was

---

[19] The law for self-defense and defense of others is virtually identical, and the Court therefore will use these terms interchangeably.

necessary to use deadly force. *See, e.g., Faubion*, 58 N.M. at 306, 270 P.2d at 715.

Defendants have failed to satisfy their summary judgment burden of demonstrating that there is an absence of evidence to support the Estate's case. Even if they had fulfilled their burden, the Estate has designated specific facts showing there is a genuine issue for trial. As described herein, taking the facts in the light most favorable to the Estate, a reasonable jury could find that there was no immediate threat and that Defendants Bitsoih and Etheredge acted unreasonably under the circumstances. *See supra* § II.A.1. The Court therefore denies Defendants' motion for summary judgment on the Estate's state law battery claim.[20]

V.    Are Defendants Entitled to Immunity from Liability on the Remaining State Law Claims?

Although the Court dismissed Plaintiffs' Section 1983 familial association claims because Plaintiffs failed to allege or provide evidence of Defendants' intent to interfere with a family relationship, the Court still must address Plaintiffs' state law tort claims for loss of familial association. Defendants argue, and the Court agrees, that the New Mexico Tort Claims Act protects Defendants from tort liability unless Plaintiffs can establish that Defendants waived their immunity under the Act. *See* N.M. Stat. Ann. § 41-4-4 (granting immunity from tort liability for "governmental entit[ies] and any public employee while acting within the scope of

---

[20] The Court further notes that even if it were to apply Section 30-2-6 and its more protective standard of police immunity, the Court nonetheless would deny Defendants' summary judgment motion. Even under Section 30-2-6, a genuine issue of material fact exists with respect to whether Defendants Bitsoih and Etheredge had probable cause to believe they were threatened with serious harm or deadly force. Although not part of its reasonableness analysis, the Court also notes that it is undisputed that Defendants did not give warning prior to using deadly force, despite the fact that Section 30-2-6(B) provides in relevant part, "Whenever feasible . . . [an officer should] give warning prior to using deadly force."

duty . . . except as waived by Sections 41-4-5 through 41-4-12"). As described herein, law enforcement officers waive their immunity under the Act for suits alleging:

> personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

N.M. Stat. Ann. § 41-4-12 . Defendants argue, and the Court agrees, that Plaintiffs' claims do not fall within this waiver provision.

For their familial association claim, Plaintiffs allege they have suffered loss of "companionship," "love," "guidance," "counseling," and "enjoyment of life" as a result of decedent's death. They also allege they have suffered "emotional distress." Plaintiff Zah further contends she has suffered "a loss of consortium and loss of future relationship" as a result of decedent's death. Although the NMTCA waives immunity for "personal injury," including injury inflicted by law enforcement officers, it only does so for injury "resulting from" an expressly-defined list of torts. None of Plaintiffs' claims is enumerated in that list. *See Caillouette v. Hercules, Inc.*, 113 N.M. 492, 497 (N.M. Ct. App. 1992) (holding that claim for "personal injury" must result from one of the torts listed in Section 41-4-12 and not simply for negligence), *cert. denied*, 113 N.M. 352, 826 P.2d 573 (N.M. 1992); *Methola v. County of Eddy*, 95 N.M. 329, 333, 622 P.2d 234 (1980) (under the New Mexico Supreme Court's interpretation of Section 41-4-12, "those acts enumerated . . . which were caused by the *negligence* of law enforcement officers while acting within the scope of their duties" are actionable) (emphasis in original). Accordingly, Defendants are immune as a matter of law from liability for Plaintiffs'

-48-

state law familial association claims, including Plaintiff Zah's claim for loss of consortium. The Court therefore grants summary judgment in favor of Defendants and dismisses the familial association claims. *Cf., e.g., Romero v. Otero*, 678 F. Supp. 1535, 1540 (D.N.M. 1987) (holding that the NMTCA does not waive the immunity of law enforcement officers for intentional infliction of emotional distress standing alone as a common law tort because it is not one of the enumerated acts under Section 41-4-12).

Alternatively, dismissal of Plaintiffs' claims is warranted because Plaintiffs were not foreseeable injured parties and Defendants therefore owed no duty to them. *See Lucero v. Salazar*, 117 N.M. 803, 805, 877 P.2d 1106, 1108 (N.M. Ct. App. 1994) (citation omitted). In *Lucero v. Salazar*, children of the deceased brought claims against police officers for violating their rights to association with their father under the New Mexico Constitution. *See id.* at 803-04, 877 P.2d at 1106-07. The defendant police officers asserted immunity, and the plaintiff children claimed the officers waived immunity under the NMTCA because defendants' conduct inflicted personal injury resulting from a deprivation of plaintiffs' "'rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico.'" *Id.* at 804, 877 P.2d at 1107 (quoting N.M. Stat. Ann. § 41-4-12). The *Lucero* court found without holding that even if defendants had waived immunity under the Act, plaintiffs were not entitled to recovery as a matter of law because they were not foreseeable injured parties. *See id.* at 805, 877 P.2d at 1108. Likewise, in *Solon v. WEK Drilling Co.*, the New Mexico Supreme Court held that the parents of an adult child were not foreseeable plaintiffs for purposes of asserting a claim for loss of consortium. *See* 113 N.M. 566, 570, 829 P.2d 645 (N.M. 1992). In this case, Plaintiffs were likewise unforeseeable injured parties, and Defendants therefore owed no duty to

-49-

them.

Plaintiff Zah's argument that she was a foreseeable injured party because she--unlike the other Plaintiffs--called the police for assistance and overheard the incident between decedent and the police also is unpersuasive because Plaintiff Zah did not set forth specific facts to establish her claim for loss of consortium. In *Lozoya v. Sanchez*, the court described the standard to determine whether an unmarried plaintiff can maintain a loss of consortium claim. *See* 133 N.M. 579, 589, 66 P.3d 948, 958 (N.M. 2003). Among other things, a claimant must prove a close familial relationship with the victim and that the relationship was committed and exclusive. *See id.*, 66 P.3d at 958. A court also must consider the duration of the relationship, the degree of mutual dependence, the extent of common contributions to a life together, the extent and quality of shared experience, whether the plaintiff and the injured person were members of the same household, their emotional reliance on each other, the particulars of their day to day relationship, and the manner in which they related to each other in attending to life's mundane requirements. *See id.* at 588, 66 P.3d at 957. In this case, Plaintiff Zah failed to allege or set forth sufficient evidence regarding these items to withstand summary judgment. *Cf. id.* at 588-89, 66 P.3d at 957-58 (burden is on claimant to demonstrate that an intimate familial relationship existed). Moreover, what little evidence is in the record regarding the relationship between Plaintiff Zah and decedent indicates that the relationship between them recently had been terminated. Accordingly, even if Plaintiff Zah's claim was not barred by the NMTCA, Defendants still would be entitled to summary judgment.

## CONCLUSION

For the reasons stated above, **IT IS THEREFORE ORDERED** that Defendants' Motion

for Summary Judgment Requesting Dismissal of Plaintiffs' Complaint, filed October 10, 2003,

[Doc. No. 33], is hereby **GRANTED IN PART** as follows:

1.    Plaintiffs' 42 U.S.C. Section 1983 personal claims for deprivation of their rights to familial association are hereby DISMISSED;

2.    Plaintiffs Louise Murphy, individually, Benjamin Murphy, Sarah Murphy, Tyrone Murphy and Valencia Zah's 42 U.S.C. Section 1983 derivative claims are hereby DISMISSED;

3.    Plaintiffs Louise Murphy, individually, Benjamin Murphy, Sarah Murphy, Tyrone Murphy and Valencia Zah's state law battery and wrongful death claims are hereby DISMISSED;

4.    All of the Estate's 42 U.S.C. Section 1983 claims, including the claims for violation of decedent's Fourth Amendment right to be free from excessive police force, against Defendant McDonald in both his individual capacity and his official capacity, are hereby DISMISSED;

5.    All of the Estate's 42 U.S.C. Section 1983 claims against Defendant Police Chief Galvin in his individual capacity, including the claims of permitting or condoning the use of excessive police force, inadequate supervision, inadequate hiring, and inadequate training, are hereby DISMISSED;

6.    The Estate's 42 U.S.C. Section 1983 claims against the Defendants City of Albuquerque and Police Chief Gerald Galvin in his official capacity for maintaining an unwritten custom or policy of permitting or condoning the use of excessive police force are hereby DISMISSED;

7.    The Estate's 42 U.S.C. Section 1983 claims against Defendants Bitsoih and Etheredge in their official capacities for use of excessive force are hereby DISMISSED;

8.    The Estate's 42 U.S.C. Section 1983 claims against Defendants City of Albuquerque and Police Chief Galvin in his official capacity for inadequate supervision are hereby DISMISSED;

9.    The Estate's 42 U.S.C. Section 1983 claims against Defendants City of

Albuquerque and Police Chief Galvin in his official capacity for inadequate hiring are hereby DISMISSED; and

10.   The Estate's state law claims against Defendants in their individual and official official capacities for loss of familial association and loss of consortium, are hereby DISMISSED.

The remainder of Defendants' Motion for Summary Judgment Requesting Dismissal of

Plaintiffs' Complaint **[Doc. No. 33]**, is hereby **DENIED IN PART** as follows:

1.   Defendants Bitsoih and Etheredge in their individual capacities are hereby DENIED summary judgment on the Estate's 42 U.S.C. Section 1983 derivative claims for violation of decedent's Fourth Amendment right to be free from excessive police force;

2.   Defendants City of Albuquerque and Police Chief Galvin in his official capacity are hereby DENIED summary judgment on the Estate's 42 U.S.C. Section 1983 derivative claims for inadequate training; Defendants City of Albuquerque and Police Chief Galvin in his official capacity are granted leave to file a motion for partial summary judgment and memoranda in support thereof on the Estate's failure to train claims within fourteen (14) days from the date of this Memorandum Opinion and Order; and

3.   Defendants Bitsoih and Etheredge in their individual and official capacities and the City of Albuquerque are hereby DENIED summary judgment on the Estate's state law battery and wrongful death claims; the City of Albuquerque is granted leave to file a motion for partial summary judgment and memoranda in support thereof on the Estate's state battery claim within fourteen (14) days from the date of this Memorandum Opinion and Order.

Dated this 1st day of June, 2004.

_____
MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

<u>Attorneys for Plaintiffs</u>:
        Colleen M. Clear, Esq.
        Thomas J. Clear, III, Esq.

<u>Attorneys for Defendants</u>:
        Robert M. White, City Attorney
        Kathryn Levy, Deputy City Attorney